UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.

IGOR CHERNYKH and
YURIY KURMAZ,

                Plaintiffs,

vs.

MORDECHAI KORF,

                Defendant.

_____/

## VERIFIED COMPLAINT

    The Plaintiffs, Igor Chernykh and Yuriy Kurmaz, sue the Defendant, Mordechai Korf, and allege:

### JURISDICTION AND VENUE

    1.    The Court has jurisdiction of this action under 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a state and citizens or subjects of a foreign state.

    2.    Venue is proper in this judicial district under 28 U.S.C. § 1391(a)(1) because Korf resides in it.

### THE PARTIES

    3.    Chernykh and Kurmaz are citizens of Ukraine.

    4.    Korf is a citizen of the state of Florida and resides in Miami Beach, Florida.

FACTUAL ALLEGATIONS

**Ukrainian Radio Systems**

5.      In the late 1990s Chernykh and Kurmaz invested in Ukrainian Radio Systems (URS), a mobile-telecommunication-service provider that was developing a telecommunication network (the URS Network) in Kiev, Ukraine. Chernykh and Kurmaz invested in URS through Interinvest, Ltd. (Interinvest), a Ukrainian limited-liability company.

6.      By July 2000 Chernykh[1] and Kurmaz held a 46.5 percent interest in Interinvest.

7.      Interinvest, in turn, held 20 percent of the shares of URS (200 shares).

8.      Ukrfondinvest Ltd. (Ukrfondinvest), a Ukrainian limited-liability company, owned 31 percent of the shares of URS.

9.      Daewoo Corporation (Daewoo) owned 49 percent of the shares of URS. Because Ukrfondinvest had pledged its shares of URS to Daewoo, Daewoo held Ukrfondinvest's shares—or 31 percent of the shares of URS—in pledge.

10.      Through Interinvest, Chernykh and Kurmaz held certain preemptive rights that gave them rights of first refusal under Ukrainian law to acquire the shares of URS held by Daewoo.

11.      The shares of or ownership interests in Interinvest are not certificated.

**Korf takes over URS**

12.      In or around 1999 Daewoo decided to stop investing in and to sell its interest in URS. Financing of the development of the URS Network stopped, and URS began to accumulate debt.

---

[1] Chernykh's interest in Interinvest and URS is held jointly with Nadezhda Chernykh. Through powers of attorney she has given Chernykh full rights to manage this interest and to represent this interest in all court proceedings. All references herein to Chernykh's interest in Interinvest and URS include her interest as well.

13.     In early 2000 Korf, through Optima Telecom Inc. (Optel), a purported Florida corporation of which Korf stated he was president, proposed to invest in URS in order to develop the URS Network. Korf was in charge and held the title of chairman of an Optel affiliate identified by the name OPTIMA that provided fixed land-line telephone service in Ukraine. According to Korf, combining fixed-land-line telephone service with mobile-telecommunication service would provide URS a greater platform and a larger customer base, thus making URS and Interinvest's interest therein more valuable.

14.     To that end, Korf wrote a letter on March 9, 2000 to Société Générale, a bank involved in the potential sale of Daewoo's interest in URS, proposing to acquire Daewoo's entire interest in URS for sums between US$17 and US$27 million, depending on valuation.

15.     Meanwhile Korf approached Interinvest's and Ukrfondinvest's shareholders, including Chernykh and Kurmaz. Korf stated that Optel wanted to acquire Daewoo's interest in URS in order to develop the URS Network. Korf also stated that, given Daewoo's position about its future in URS, Optel's investment in URS was the only way to make URS a viable and valuable going concern.

16.     To further this goal, Korf met and conferred with Chernykh and Kurmaz multiple times about Optel's potential acquisition of Daewoo's interest in URS. Many of these conferences took place over the phone when Korf was in Miami Beach, Florida.

17.     In one in-person meeting, Interinvest and Optel entered into a Memorandum of Mutual Understanding (the First MOU) in Kiev, Ukraine, on April 14, 2000. According to the First MOU, Optel would offer Daewoo a reasonable and competitive price for its shares. If Daewoo would not sell its shares to Optel, however, then Optel would provide Interinvest with sufficient funds for it to use its preemptive rights to buy Daewoo's shares. If Optel did not comply

3

with these terms, Optel agreed to buy from Interinvest's shareholders 100 percent of their interest in Interinvest, i.e., 20 percent of the shares of URS, for a price equal to 20 percent of the shares of URS but not less than US$2.1 million. After the transactions, Optel would hold Daewoo's former interest in URS—49 percent and the right of pledge of 31 percent of the shares of URS, respectively—and Interinvest would hold 20 percent of the shares of URS.

18.    Korf signed the First MOU on behalf of Optel with Interinvest.

19.    Optel's offer, however, was not what Daewoo had hoped for, and the transactions contemplated in the First MOU were not completed.

20.    Korf nevertheless continued his efforts to acquire URS. On July 14, 2000, Kurmaz, on the instruction of Interinvest's and Ukrfondinvest's shareholders, met in Kiev with Korf and other managers of Optel and PrivatBank, a bank with close ties to Korf. At the meeting, Korf proposed that Optel or companies designated and controlled by Korf would use Interinvest's and Ukrfondinvest's preemptive rights available under Ukrainian law in order to negotiate directly with Daewoo and to acquire Daewoo's interest in URS. Korf told Kurmaz that after Optel acquired Daewoo's interest in URS, Interinvest's and Ukrfondinvest's shareholders would hold 10 percent of the shares of URS. Korf stated that combining OPTIMA's fixed-land-line telephone service with URS's mobile-telecommunication service would make that 10 percent interest in URS much more valuable than the 20 percent interest that Interinvest then held in URS.

21.    On July 20, 2000, Interinvest and Optel entered into a Memorandum of Understanding (the Second MOU) in Kiev. In addition to Interinvest and Optel, four other Ukrainian limited-liability companies entered into this MOU: Solm Ltd., Indeko Ltd., Business-Invest Ltd., and Ukrfondinvest. Korf was affiliated with and controlled Solm, Indeko, and Business-Invest.

4

22.     As in the First MOU, Korf's stated goal in the Second MOU was to use Optel and its affiliates to acquire Daewoo's interest in URS in order to develop the URS Network. The parties agreed to a procedure by which Optel could use Interinvest's and Ukrfondinvest's preemptive rights in negotiating directly with Daewoo. This required Chernykh and Kurmaz to transfer control of Interinvest to Korf and for Vladamir Yartsev, a Korf appointee and confidant, to replace the general director of Interinvest and to hold that position throughout the negotiations with Daewoo. The Second MOU contemplated that after a series of transactions Optel would hold 49 percent of the shares of URS, Ukrfondinvest would hold 31 percent of the shares of URS, Business-Invest would hold 10 percent of the shares of URS, and Interinvest would hold 10 percent of the shares of URS. Thereafter Interinvest's former general director would replace Yartsev, and Chernykh and Kurmaz would regain control of Interinvest.

23.     As security for Chernykh's and Kurmaz's interest in URS, Korf represented to them that they would receive promissory notes at a value of 10 percent of the total debt owed to Daewoo and later to Optel after Optel had acquired Daewoo's stake.

**The transaction and the resulting shareholders of Interinvest**

24.     The transaction as contemplated by the Second MOU was partially modified because Interinvest ended up keeping 20 percent of the shares of URS.

25.     After the transaction, Interinvest's shareholders were (1) Business-Invest, which held a 50 percent interest; (2) Chernykh and Kurmaz, who held a 46.5 percent interest; and (3) Olena Mykolaivna Danilova, who held the remaining interest. In late 2003 Danilova transferred her interest completely to Chernykh and Kurmaz, so since then Chernykh and Kurmaz have held a 50 percent interest in Interinvest. All this time, however, Korf controlled Interinvest through Yartsev, because Yartsev remained the general director of Interinvest.

26.     Because Chernykh and Kurmaz held a 50 percent interest in Interinvest, and be-
cause Interinvest held 20 percent of the shares of URS, Chernykh and Kurmaz therefore effec-
tively held 10 percent of the shares of URS.

**According to plan, Korf divests Chernykh and Kurmaz of their interest in URS**

27.     On July 25, 2001, Yartsev, at Korf's direction, pledged 200 shares of URS, i.e.,
the 20 percent interest Interinvest held in URS, to PrivatBank to secure a credit of 21,488,000.00
Ukrainian hryvnia (UAH) (approximately US$4 million). Neither Chernykh nor Kurmaz was
informed of this pledge.

28.     On February 26, 2003, Yartsev, at Korf's direction, and PrivatBank agreed to ter-
minate the July 25, 2001, deed of pledge, and Yartsev agreed to set the shares free of the deed.
Neither Chernykh nor Kurmaz was informed of this agreement.

29.     Also unbeknown to Chernykh and Kurmaz, on February 26, 2003, PrivatBank, on
the authority of a commission agreement executed on the same day, entered into an agreement to
sell 200 shares (20 percent) of URS to Ravenscroft Holdings Limited (Ravenscroft), an entity
indirectly controlled by Korf and organized under the laws of the British Virgin Islands, for only
US$3,940.00. This was done despite the fact that in 2001 these 200 shares had secured a credit of
US$4 million and in 2000 Korf agreed that 200 shares of URS were worth at least US$2.1 mil-
lion, according to the First MOU, and as much as US$6.75 million, which is how much 200
shares of URS were worth according to Korf's March 9, 2000, offer letter. Neither Chernykh nor
Kurmaz was informed that an agreement for the sale of these shares had been entered into or that
a sale was contemplated.

30.     During this period Korf acquired directly and indirectly through controlled enti-

ties Daewoo's entire interest in URS without the knowledge or participation of Chernykh or

Kurmaz.

31.     On November 25, 2005, Korf and Ravenscroft, without informing Chernykh or

Kurmaz, sold all the shares of URS to VimpelCom, a Russian publicly traded telecommunica-

tions company, for US$231,000,000. Two hundred shares (20 percent of the shares of URS)

were therefore worth US$46,200,000. Korf is listed as a seller in public documents regarding this

transaction—verifying that the acquisition of URS that Korf contemplated making in 2000 in-

deed took place.

32.     On August 1, 2006, PrivatBank, as seller, and Ravenscroft, as buyer, signed a pri-

vate agreement entitled an Act of Securities Acceptance and Transfer in regard to the 200 shares

of URS that were initially held by Interinvest and were in the November 25, 2005, sale to Vim-

pelCom.

**Korf and Yartsev shut Chernykh and Kurmaz out of Interinvest**

33.     All this time neither Chernykh nor Kurmaz knew what Korf or Yartsev was

doing, despite their repeatedly trying to communicate with and obtain information from Korf and

Yartsev. Further, the notes promised by Korf were never delivered.

34.     Accordingly, Chernykh and Kurmaz tried to obtain information from Ukrainian

authorities on the status of their rights in Interinvest and URS. In particular:

   a.   In or around July 2003 Chernykh filed a claim in the district court of Kiev to ex-

        clude Business-Invest as a participant of Interinvest because of the lack of infor-

        mation he was receiving from Korf and Yartsev. The court denied the claim.

7

b.   In or around December 2004 Chernykh tried to convene and duly noticed a General Meeting of Participants of Interinvest. The goal was to obtain knowledge about, among other things, transactions about Interinvest's assets, i.e., the shares of URS, since the signing of the Second MOU and to learn about Business-Invest's participation in Interinvest. The meeting served no purpose, however, because neither Yartsev nor a Business-Invest representative appeared.

c.   In 2005 Chernykh notified the Parliament Committee of Supreme Rada of Ukraine on the Struggle Against Organizational Criminality and Corruption about Interinvest. In or around October 2005 the Committee sent the request to the General Public Prosecutor's Office. In or around July 2005, moreover, members of Parliament sent an official letter to the Deputy of Public General Prosecutor to investigate. And in or around September 2005 another member of Parliament sent another letter to, among others, the President of Ukraine. These letters generated no response.

d.   Chernykh also contacted the Prosecutor's Office of Kiev. As a result, the office opened—and shortly thereafter closed—a criminal case on Interinvest.

e.   Also in 2005 Chernykh and Kurmaz attempted to interrupt the sale of URS to VimpelCom. Because no General Meeting of Participants of Interinvest had been held, and therefore no authority existed to sell Interinvest's shares of URS, Chernykh and Kurmaz believed that VimpelCom would know that any acquisition of URS could later be voided. Chernykh and Kurmaz were unsuccessful.

f.   In or around July 2006 Chernykh filed an action against Interinvest and Yartsev seeking to remove Yartsev from his position as director of Interinvest. The basis

8

of the action was because general meetings of Interinvest had not been held—as they were required to be—and because Yartsev failed to fulfill his responsibilities as director. In addition, because directors were appointed to five-year terms only and because Yartsev failed to hold a further meeting on his reelection, his term had expired. In November 2006 the district court of Kiev ruled in Chernykh's favor and dismissed Yartsev as director. But Yartsev left no records of the transactions undertaken by him that led to the sale of Interinvest's interest in URS to Ravenscroft and from Ravenscroft to VimpelCom.

**Chernykh and Kurmaz discover that Korf had defrauded them**

35.    On January 23 or 24, 2007, as a result of the prior investigations, Chernykh and Kurmaz received from the police department documents that established Korf had defrauded them and how that fraud was perpetrated. In particular it was then that Chernykh and Kurmaz first saw a copy of the Act of Securities Acceptance and Transfer, which stated that PrivatBank had sold the 200 shares (20 percent of the shares of URS) owned by Interinvest to Ravenscroft for US$3,940—a pittance compared to the shares' value in November 2005 (US$46,200,000) or even to the shares' value in 2000, when Korf sought to acquire all of Daewoo's interest in URS for between US$17 and US$27 million.

36.    Before January 23 or 24, 2007, neither Chernykh nor Kurmaz had discovered the facts giving rise to the fraud, and they could not have discovered the facts giving rise to the fraud with due diligence. That is because Korf and Yartsev shut Chernykh and Kurmaz out of Interinvest, and Chernykh's and Kurmaz's attempts to go through other channels to obtain knowledge about Korf's and Yartsev's activities led nowhere.

37.     There is no available remedy against Korf in Ukraine, despite Chernykh's and Kurmaz's best efforts, as stated above. Additionally the Ukrainian justice system is regarded as unfair, untrustworthy, and worse: "Interviews with legal experts as well as recent nationwide polling indicate that Ukrainians believe that corruption plagues the judicial system in Ukraine."[2] Indeed, Transparency International ranks Ukraine 146 of 180 countries on the Corruption Perceptions Index 2009.[3] Further, in its 2009 report Freedom House, an independent watchdog organization, stated: "Misuse of the judiciary for political purposes took an unprecedented wide character in Ukraine in 2008; therefore, the rating for judicial framework and independence worsens from 4.75 to 5.00."[4] The judicial system in Ukraine fared no better the following year: "Due to the lack of action, despite declarations of priority in securing sufficient funding for its functioning and independence, and in eradicating corruption within the judiciary, Ukraine's rating for judicial framework and independence remains at 5.00."[5] Given Chernykh's and Kurmaz's unsuccessful efforts at pursuing remedies in Ukraine, as well as the corruption in the country's legal system, Chernykh and Kurmaz must seek redress in the United States: where Korf resides and enjoys the bounty of his misdeeds.

## COUNT I: FRAUD

38.     Chernykh and Kurmaz reallege each allegation above as if fully set forth herein.

---

[2] The Atlantic Council of the United States, Corruption, Democracy, and Investment in Ukraine 11 (2007),
http://www.acus.org/docs/071016_Corruption,%20Democracy,%20and%20Investment%20in%22Ukraine.pdf.

[3] *See* Transparency International,
http://www.transparency.org/policy_research/surveys_indices/cpi/2009/cpi_2009_table.

[4] Nations in Transit 2009 at 559 (13th ed. 2009) (emphasis omitted),
http://www.freedomhouse.org/uploads/nit/2009/Ukraine-final.pdf.

[5] Nations in Transit 2010 at 552 (14th ed. 2010) (emphasis omitted),
http://www.freedomhouse.org/images/File/nit/2010/NIT2010Ukrainefinal2.pdf.

39.     At or around the time of the Second MOU, Korf made false statements in person and on the telephone from Miami Beach about material facts. Specifically, Korf, as part of his fraudulent scheme to take control of Interinvest in order to use Interinvest's preemptive rights to acquire Daewoo's interest in URS and to later divest Chernykh and Kurmaz of their interest in URS without paying proper value, materially falsely represented to Chernykh and Kurmaz that he would only require temporary control of Interinvest in order to allow him to negotiate directly with Daewoo. Korf further told Chernykh and Kurmaz that he would return control of Interinvest to Chernykh and Kurmaz after the Daewoo transaction was completed. Korf also told Chernykh and Kurmaz that they would hold a much more valuable 10 percent interest in URS thanks to the synergy of OPTIMA's fixed-land-line telephone service combined with URS's mobile-telecommunication service. Last, to further induce them, Korf told Chernykh and Kurmaz that they would be provided with promissory notes as security for their interest in URS through Interinvest pending the transfer of control. Chernykh and Kurmaz relied to their detriment on these false representations and transferred control of Interinvest to Korf.

40.     Korf also lied about Optel's existence as a U.S. telecommunications company based in Miami Beach, Florida, because, on information and belief, no company by the name Optima Telecom, Inc. has ever had a Florida presence.

41.     When he made these representations, Korf knew that they were false: Korf had no intention of returning control of Interinvest to Chernykh and Kurmaz after the Daewoo transaction was completed, of ensuring that Chernykh and Kurmaz would hold 10 percent of the interest in URS, or that he would give the promissory notes to Chernykh and Kurmaz. That is because Korf made these representations in order to later sell all of Interinvest's interest in URS as his

11

own and at an enormous profit, as Korf ultimately did to VimpelCom without ever having merged his fixed-land-line telephone service with URS's mobile-telecommunication service.

42.     Korf intended that these representations induce Chernykh's and Kurmaz's reliance thereon to enter into the transactions—namely, for Chernykh and Kurmaz to give up control of Interinvest so that Korf could divest them of their interest in URS and to profit from his wrongful and deceitful actions.

43.     To their detriment, Chernykh and Kurmaz relied on these representations and have sustained damages at least equal to US$23,100,000, which is the value of their 10 percent of the shares in URS sold by Korf through fraud and deceit to VimpelCom.

WHEREFORE, Chernykh and Kurmaz respectfully request that the Court enter judgment in their favor and against Korf for full compensatory, consequential, and punitive damages, and attorney's fees and any other relief the Court considers just and proper.

VERIFICATIONS

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the facts and representations made by Korf and the foregoing are true and correct based on my personal knowledge.

Executed on December 20, 2010

_____
Igor Chernykh


In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the facts and representations made by Korf and the foregoing are true and correct based on my personal knowledge.

Executed on December 20, 2010.

_____
Yuriy Kurmaz

Dated December 20, 2010.

Respectfully submitted,

HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Telephone: (305) 374-8500
Fax:  (305) 789-7799

By: _____
George Mencio Jr.
Florida Bar No. 335861
george.mencio@hklaw.com
Brian W. Toth
Florida Bar No. 57708
brian.toth@hklaw.com

#9769928_v7